**Affirmed and Opinion Filed December 31, 2020**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-18-01543-CV**
_____

**GUSTAVO NOEL HINOJOSA, Appellant**

**V.**

**STEVE PAUL LAFREDO, Appellee**

**On Appeal from the 302nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-15-16693**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Partida-Kipness

The underlying proceeding involved a suit for the dissolution of an alleged marriage of a same-sex couple brought by appellant Gustavo Noel Hinojosa. In the first phase of a bifurcated trial, the jury determined the parties were not informally married. The trial court rendered judgment on the verdict and entered a take nothing judgment against Hinojosa. On appeal, Hinojosa seeks a new trial based on purported charge error. We affirm the judgment.

## BACKGROUND

Hinojosa met appellee Steve Paul LaFredo in November 1997 at a bath house in New York City. The men began a romantic relationship. After dating for almost two years, Hinojosa moved into LaFredo's co-op in September 1999. The men agreed that Hinojosa would pay LaFredo monthly rent of $1,200, which was roughly half of what Hinojosa was paying for rent at his apartment at that time. According to Hinojosa, the men also tried to roughly split their other living expenses.

The couple spent Christmas 1999 at a home in the Catskill Mountains with Hinojosa's friends, Linda Myers and George Wolfgang. LaFredo gave Hinojosa a Christmas card during the trip. On the back of the card he handwrote the following: "Will you Marry (commit) ME IN 2000? PLEASE!!! With all our friends and family in attendance!!!" Hinojosa testified that he took this as an honest proposal of marriage. In his mind, LaFredo asked him to marry LaFredo and he said yes. LaFredo, in contrast, testified that he did not intend this to be a marriage proposal. He was asking LaFredo to be committed, which is why LaFredo wrote "commit" in parenthesis after "Marry." LaFredo testified that he and Hinojosa knew it was impossible for two men to legally marry at that time, and they both knew LaFredo was only asking Hinojosa to commit to the relationship in a commitment ceremony.

After the holidays, Hinojosa and LaFredo began planning a commitment ceremony. LaFredo testified that they considered having a dinner in New York because lots of commitment ceremonies were happening at that time in New York.

–2–

They also considered Vermont because that state had recently legalized civil unions. Vermont was, thus, an option if they "wanted to do something that was recognized." But LaFredo told the jury that he and Hinojosa made "a very deliberate decision" against having the ceremony in Vermont "because this was a commitment ceremony and not a marriage, we were not looking for a piece of paper." They ultimately decided to host the ceremony in Italy because Hinojosa spent his junior year of college in Rome studying architecture and LaFredo's family is of Italian descent.

Hinojosa took the lead in finding a location for the ceremony. The couple invited forty-seven of their friends and family to join them at a villa in Tuscany for a week-long celebration in October 2000. Hinojosa and LaFredo agreed on the language and design for the invitation, and Hinojosa sent the invitation to the guests. The invitation stated that Hinojosa and LaFredo "request your company to celebrate our union the week of October twenty-one to October twenty-eight Two Thousand at The Villa Petrolo Tuscany Italy." Underneath that information, the invitation stated "Commitment Ceremony on October twenty-six at five o'clock in the evening at The Villa." By all accounts, everyone who attended the week-long celebration had a wonderful time. In the days leading up to the commitment ceremony, guests toured Tuscany, enjoyed group dinners, and got to know one another. On October 26, 2000, they attended the commitment ceremony. And it is here that the parties' description of events diverge.

The video of the ceremony shows the officiant, Ariel Sebastian, leading Hinojosa, LaFredo, and their guests into the villa before the ceremony while she smudged the room with burning sage to purify the room for the ceremony. During the ceremony, guests sat in chairs in a circle surrounding Ariel, Hinojosa, and LaFredo. Ariel described the ceremony as an "ancient pagan celebration of unity" during which Hinojosa and LaFredo agreed to take the other as their loving partner. The men exchanged rings, lit a unity candle, and accepted each other as life partners. At the conclusion of the ceremony, Ariel pronounced the men "Life Partner." She did not use the term "marriage" or "spouse" during the ceremony.

Hinojosa described the commitment ceremony as a wedding where he and LaFredo said vows, exchanged custom-designed rings, lit a unity candle, and shared a post-nuptial kiss after being pronounced life partners. At the reception, the couple cut the cake together, fed each other pieces of cake, and even pushed cake into each other's faces. He told the jury that LaFredo never objected to him referring to the ceremony as a wedding in LaFredo's presence, and that LaFredo told him that the ceremony was their wedding on more than one occasion.

LaFredo on the other hand was adamant at trial that the event in Italy was only a commitment ceremony. To LaFredo, the ceremony "was an event to have friends and family celebrate our love for each other, be a part of support. As a same-sex couple, support was something that was important. The entire plan, all of the time, was to have a circle of friends and family that would support our relationship."

LaFredo told the jury that he and Hinojosa took deliberate steps to "exclude it from looking like a marriage." These steps included choosing a location that did not recognize same-sex marriages or civil unions and purposely excluding the words "God" and "marriage" from the officiant's script for the ceremony. Ariel was a friend of a very good friend who oversaw the ceremony and followed a script that he and Hinojosa put together. LaFredo did not know if Ariel was a minister or was licensed to perform any kind of wedding ceremony. He considered her more of a coordinator. LaFredo did not ask Ariel to get a marriage license for him, and he and Hinojosa never obtained a marriage license because "[w]e never talked about getting married." LaFredo also testified that no one used the word "marriage" during the days leading up to the ceremony in Italy, and no one used the word marriage in any theme or in any response in front of the crowd or group.

LaFredo further testified that when the couple returned to New York after the ceremony, he told coworkers that they had a ceremony and he introduced Hinojosa after that as his "partner." But nothing changed between he and Hinojosa after the ceremony. LaFredo was consistent in his testimony that he has at no time called Hinojosa his spouse, he never introduced Hinojosa as his spouse, and never heard Hinojosa introduce him as Hinojosa's spouse at any time. LaFredo also testified that he never intended to marry Hinojosa, and he took no actions to marry Hinojosa after the commitment ceremony. Even though Massachusetts legalized same-sex marriage in 2003 and he and Hinojosa travelled to Cape Cod, they did not talk about

going there to get married. According to LaFredo, he and Hinojosa did not ever talk about getting married. He also told the jury that he "does not honestly know" if he would have proposed marriage to Hinojosa in Christmas 1999 if same-sex marriage had been legally recognized at that time but, if he had, he "would have probably done additional steps if that would have been the case."

Hinojosa maintained that after returning to New York following the ceremony, he and LaFredo referred to themselves as married in front of others, and he introduced LaFredo to others as his spouse after the ceremony.

Not surprisingly, the witnesses who testified on behalf of Hinojosa agreed with his view of the ceremony and his relationship with LaFredo, and LaFredo's witnesses agreed with his view of these matters. Hinojosa's witnesses felt the ceremony in Italy was a wedding ceremony and said the couple presented themselves as a married couple when they socialized in New York and later in Texas. Each of Hinojosa's witnesses testified that they would be surprised or shocked to learn that the couple did not consider themselves to be a married couple. Although Hinojosa's witnesses maintained that the couple behaved like a married couple or held themselves out as a married couple, none of his witnesses testified that they ever witnessed LaFredo referring to Hinojosa as his spouse or husband. Linda Meyers, a long-time friend of Hinojosa that he referred to as a surrogate mother, testified that she never witnessed LaFredo refer to Hinojosa as his husband when he interacted with other people, and she never witnessed Hinojosa refer to LaFredo as his husband.

Susan Held, another long-time friend of Hinojosa, testified that she never heard Hinojosa refer to LaFredo as his husband or his spouse.

LaFredo's witnesses testified that no one used the word "marriage" during the ceremony and they considered the event a commitment ceremony not a marriage. They also testified that they never heard LaFredo refer to Hinojosa as his spouse or husband in New York or in Texas. According to LaFredo's sister-in-law, after the couple moved to Texas, she never heard the terms "married" or "spouse" or "husband." LaFredo's other witnesses agreed that LaFredo did not refer to Hinojosa as his "spouse" or his "husband" to others and did not tell people he was married. Milagros Beck, who had known LaFredo since the late 1980s and known Hinojosa since the late 1990s, further testified that she never heard Hinojosa refer to LaFredo as his husband or spouse.

The couple returned to New York after the ceremony and continued to live together in New York until early 2005 when LaFredo's company transferred him to Dallas. LaFredo moved to Texas in January 2005. Hinojosa moved to Texas in March 2005 after the sale of the co-op closed and he finished some projects for work in New York. The men bought a house together in Dallas and later a condo. The men signed the purchase documents as "single men" and were co-owners of the properties. Throughout the relationship, the men maintained separate bank accounts, filed separate tax returns as single individuals, and attempted to split their expenses evenly.

The relationship hit rough patches in 2006 and again in 2010. LaFredo testified that by 2014, he had had enough of the relationship and decided to end it. He moved to Houston in January 2014 for a job opportunity with a new company. Hinojosa did not move to Houston with LaFredo because, according to LaFredo, "we were having major problems at that time, and it was never a discussion." LaFredo testified that he told Hinojosa in a phone call in April 2014 that he did not want to continue the relationship.

Hinojosa disagreed with LaFredo's recollection of the break-up. According to Hinojosa, when LaFredo moved to Houston in January 2014, the couple planned to see if the job was a good fit before moving Hinojosa to Houston. Hinojosa testified that he visited LaFredo in Houston a couple of times, but LaFredo visited him in Dallas many times and the two had sex on March 25, 2015. According to Hinojosa, the marriage became troubled May 2, 2015, and Hinojosa filed for divorce in late August 2015.

LaFredo denied having sex with Hinojosa at any time after his move to Houston in January 2014. He testified that the couple had not had sex since October 12, 2010. Although he admitted staying at the couple's condo seven or eight times between January and April 2014, LaFredo maintained that he was only in Dallas for work-related reasons. After April 2014 he stayed at hotels or with other friends when he travelled to Dallas.

## THE TRIAL

Hinojosa filed for divorce on August 24, 2015. He pleaded that the couple were formally married on October 26, 2000 or, alternatively, established an informal marriage under the Texas Family Code as of March 1, 2005. According to Hinojosa, under either marriage theory, they ceased to live together as spouses about the time Hinojosa filed for divorce. At trial, Hinojosa presented evidence that LaFredo and he were formally married in a traditional, ceremonial wedding in Italy on October 26, 2000, complete with the exchanging of vows and an exchanging of a kiss after a pronouncement by the officiant. LaFredo presented evidence that this was not a wedding at all but was merely a commitment ceremony.

The jury charge, however, did not include a question regarding whether Hinojosa and LaFredo became formally married through that ceremony. Instead, the charge asked whether the men were "informally married," and, if yes, on what date they were married. :

SPECIAL INSTRUCTION[1] FOR QUESTION NUMBER 1

Two people are considered informally married if:

a. they agree to be married, and

b. after the agreement, they lived together in Texas as spouses, and

c. there represented to others that they were married.

_____

[1] This special instruction tracked the statutory requirements for an informal marriage under TEX. FAM. CODE § 2.401(a)(2).

–9–

QUESTION NUMBER 1

Are GUSTOVA NOEL HINOJOSA and STEVE PAUL LAFREDO informally

married?

> Answer "Yes" or "No."

> Answer:_____


If you answer Question 1 "Yes", then answer Question 2. Otherwise, do not answer Question 2.

QUESTION NUMBER 2

When were GUSTAVO NOEL HINOJOSA and STEVE PAUL LAFREDO

married?

Answer by stating the date of the marriage.

> ANSWER: _____

Before delivering its verdict, the jury sent the following question to the trial judge:

> If a same sex couple met the requirements of informal marriage before June 26, 2015, does the Obergefell decision state whether the effective date of the informal marriage is the date of the Supreme Court decision or the date the conditions were met?

The trial court provided the following response:

> You have all the law and instructions to answer the question in the jury charge.

In a 10 to 2 vote, the jury answered "No" to Question Number 1 and did not answer Question Number 2.

On October 31, 2018, the trial court signed a Final Order on the verdict that ordered no marriage existed between Hinojosa and LaFredo and rendered a take nothing judgment against Hinojosa. The trial court denied Hinojosa's subsequently-filed motion for new trial by written order on December 6, 2018. This appeal followed.

## STANDARD OF REVIEW

Trial courts have broad discretion in formulating a charge to submit disputed issues to the jury. *Wal-Mart Stores Tex., LLC v. Bishop*, 553 S.W.3d 648, 673 (Tex. App.—Dallas 2018, pet. granted w.r.m.). The standard of review for jury charge error is abuse of discretion. *Webb v. Glenbrook Owners Ass'n. Inc.*, 298 S.W.3d 374, 380 (Tex. App.—Dallas 2009, no pet.) ("We review claimed error in the court's charge under an abuse of discretion standard."). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or if it acts without reference to guiding rules or principles. *Bishop*, 553 S.W.3d at 673 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). We do not reverse for jury charge error in the absence of harm. *Bishop*,

553 S.W.3d at 673 (citing *Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756–57 (Tex. 1995) (per curiam)). For harm to result, the error must probably cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of. . . probably caused the rendition of an improper judgment."); *Friday v. Spears*, 975 S.W.2d 699, 700 (Tex. App.—Texarkana 1998, no pet.) ("Error in the jury charge is reversible only if it probably caused the rendition of an improper verdict."). We review the entire record to determine whether the submission or refusal to submit an instruction probably resulted in an improper judgment. *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998).

To preserve error in the charge, the objecting party must present a complaint to the trial court that distinctly designates the error and grounds for the objection. TEX. R. APP. P. 33.1(a)(1); TEX. R. CIV. P. 272, 274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). Any complaint pertaining to an instruction is waived unless specifically included in the objection. *Bishop*, 553 S.W.3d at 674 (citing *Sears, Roebuck & Co. v. Abell*, 157 S.W.3d 886, 891 (Tex. App.—El Paso 2005, pet. denied)); TEX. R. CIV. P. 274. Objections to the charge and requests for instructions must comport with the arguments made on appeal. *Bishop*, 553 S.W.3d at 674 (citing *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 383 (Tex. App.—Houston [1st Dist.]

2011, no pet.)). If the objection at trial is not the same as the complaint on appeal, the issue has not been preserved for review. *Id.*

## APPLICABLE LAW

Texas law provides two ways to enter into a valid marriage. *Miller v. Berryhill*, 5:16-CV-078-BQ, 2017 WL 2493626, at *4 (N.D. Tex. May 16, 2017), *report and recommendation adopted*, 5:16-CV-078-C, 2017 WL 2493131 (N.D. Tex. June 8, 2017). The first is through a ceremonial marriage, performed by a person authorized to conduct a marriage ceremony. *See* TEX. FAM. CODE §§ 2.001, 2.202. The second is when a couple enters into an informal marriage—i.e., a common law marriage. *See id.* § 2.401.

In Texas, to enter into a valid ceremonial marriage: (1) a couple must obtain a marriage license; (2) the county clerk must execute the marriage license; (3) the ceremony must be performed within ninety days of issuance of the license; and (4) the ceremony must be conducted by a clergyman, state or federal judge, or other public official as defined by the family code.[2] TEX. FAM. CODE §§ 2.001(a), 2.008, 2.201, 2.202; *Johnson v. Astrue*, No. H-11-2748, 2012 WL 3561449, at *3 (S.D.

---

[2] (a) The following persons are authorized to conduct a marriage ceremony: (1) a licensed or ordained Christian minister or priest; (2) a Jewish rabbi; (3) a person who is an officer of a religious organization and who is authorized by the organization to conduct a marriage ceremony; (4) a justice of the supreme court, judge of the court of criminal appeals, justice of the courts of appeals, judge of the district, county, and probate courts, judge of the county courts at law, judge of the courts of domestic relations, judge of the juvenile courts, retired justice or judge of those courts, justice of the peace, retired justice of the peace, judge of a municipal court, retired judge of a municipal court, associate judge of a statutory probate court, retired associate judge of a statutory probate court, associate judge of a county court at law, retired associate judge of a county court at law, or judge or magistrate of a federal court of this state; and (5) a retired judge or magistrate of a federal court of this state. TEX. FAM. CODE § 2.202(a).

Tex. Aug. 15, 2012) ("In Texas, a valid marriage can be established through a ceremony performed by a clergyman or other public official."). Upon completion of the ceremony, "the person who conducts a marriage ceremony shall record on the license the date on which and the county in which the ceremony is performed . . . and return the license to the county clerk who issued it not later than the 30th day after the date the ceremony is conducted." TEX. FAM. CODE § 2.206(a).

The family code provides two methods for establishing the existence of an informal, or common law, marriage. One method is by presenting evidence that the parties filed a declaration of informal marriage with the county clerk. TEX. FAM. CODE § 2.401(a)(1). The filing of a declaration of informal marriage constitutes "prima facie evidence of the marriage of the parties." *Id.* § 2.404(d). Evidence may be offered, however, to rebut "the existence of the marriage as sworn to or stated in the declaration." *Colburn v. State*, 966 S.W.2d 511, 514 (Tex. Crim. App. 1998).

The couple may also establish an informal marriage by demonstrating that: (1) they "agreed to be married"; and (2) "after the agreement they lived together in [Texas] as husband and wife"; and (3) there they "represented to others that they were married." TEX. FAM. CODE § 2.401(a)(2); *see also Russell v. Russell*, 865 S.W.2d 929, 931 (Tex. 1993) ("Although such a declaration [of informal marriage] constitutes prima facie proof of the parties['] informal marriage, the parties need not make the declaration to have a valid common law marriage."). The party seeking to establish the existence of an informal marriage "bears the burden of demonstrating

–14–

the three elements by a preponderance of the evidence." *Farrell v. Farrell*, 459 S.W.3d 114, 117 (Tex. App.—El Paso 2015, no pet.) (citing *Small v. McMaster*, 352 S.W.3d 280, 282–83 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)); *Miller*, 2017 WL 2493626, at *5.

## ANALYSIS

In two issues, Hinojosa seeks a new trial based on purported charge error. First, he complains the jury was not given the opportunity to determine whether he and LaFredo were formally married in Italy on October 26, 2000. Second, he contends the instruction that Texas did not legally recognize same-sex marriage prior to June 26, 2015[3] was an incorrect statement of the law and, alternatively, was incomplete, which confused the jury and probably resulted in an improper verdict. We address each issue in turn.

## I. Refusal to include a question as to formal, ceremonial marriage

In his first issue, Hinojosa complains the trial court abused its discretion by refusing his request that the jury charge include a question as to whether he and LaFredo became married on October 26, 2000 and by overruling his objection to the omission from the charge of a question regarding the existence of a formal,

---

[3] On June 26, 2015, the United States Supreme Court issued *Obergefell v. Hodges* in which the Court held that "same-sex couples may exercise the fundamental right to marry," and the state laws challenged in that case were "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." 576 U.S. 644, 675–76, 135 S. Ct. 2584, 2604– 05, 192 L.Ed.2d 609 (2015). Following *Obergefell*, Texas laws limiting marriage to heterosexual unions are now unconstitutional.

ceremonial marriage between he and LaFredo. We overrule this first issue because the question Hinojosa requested was not in substantially correct wording.

The failure of the trial court to submit a jury question is not grounds for reversal unless the party submitting it has requested it in "substantially correct wording." TEX. R. CIV. P. 278. A question tendered in substantially correct wording must be correct "in substance and in the main" and "not affirmatively incorrect." *Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex. 1987); *Rivera v. Herndon Marine Products, Inc.*, 895 S.W.2d 430, 433 (Tex. App.—Corpus Christi–Edinburg 1995, writ denied). A request is affirmatively incorrect if it assumes material controverted facts. *Collins v. Beste*, 840 S.W.2d 788, 791 (Tex. App.—Fort Worth 1992, writ denied) (citing *Placencio*, 724 S.W.2d at 21). Similarly, a request is not substantially correct if it contains a term that requires a definition but the party fails to tender the definition. *Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 479 (Tex. 1978); *Watson v. Brazos Elec. Power Co-op., Inc.*, 918 S.W.2d 639, 645 (Tex. App.—Waco 1996, writ denied) ("If a question contains a legal term, *i.e.*, nuisance, and no definition of the legal term is offered, then the requested question does not provide guidance to the jury that would enable it to reach a proper verdict."). Further, a request is not substantially correct if it is too vague. *Coleson v. Lovette*, No. 02-99-00366-CV, 2001 WL 1289491, at *5 (Tex. App.—Fort Worth Oct. 4, 2001, no pet.) (not designated for publication) (proposed question and instruction too vague to be considered substantially correct because they did not explain when the statute

–16–

of limitations began to run); *Perez v. Weingarten Realty Inv'rs*, 881 S.W.2d 490, 493 (Tex. App.—San Antonio 1994, writ denied) ("Jury issues which are too vague are not substantially correct.").

Here, Hinojosa requested submission of the following question and accompanying instructions to submit his claim that a formal marriage existed between he and LaFredo:

Did GUSTAVO NOEL HINOJOSA and STEVE PAUL LAFREDO become married on October 26, 2000.

> Answer "Yes" or "No."

> ANSWER:_____

> Every marriage entered into in this state is presumed to be valid unless expressly made void by Chapter 6.

> The law of this state applies to persons married elsewhere who are domiciled in this state.

The Texas Pattern Jury Charges do not include a pattern charge on the existence of a formal, ceremonial marriage. As noted above, the family code provides the following requirements to enter into a valid ceremonial marriage: (1) a couple must obtain a marriage license; (2) the county clerk must execute the marriage license; (3) the ceremony must be performed within ninety days of issuance of the license; and (4) the ceremony must be conducted by a clergyman, state or federal judge, or other public official as defined by the family code. TEX. FAM. CODE §§ 2.001(a), 2.008, 2.201, 2.202, 2.206(a).

Here, it is undisputed that Hinojosa and LaFredo did not meet the first three requirements of a formal, ceremonial marriage because they did not have a marriage license. This is not surprising because at the time of the October 26, 2000 commitment ceremony same-sex couples were legally prohibited from obtaining a marriage license in Texas, and county clerks in Texas were prohibited from executing a marriage license on their behalf. Hinojosa argues on appeal that *Obergefell* retroactively removed those legal impediments to recognizing a formal, ceremonial marriage between he and LaFredo. In essence, LaFredo urges this Court to conclude that Texas must recognize any pre-*Obergefell* commitment ceremony between a same-sex couple as a formal, ceremonial marriage regardless of the character of the ceremony and the efforts of the parties to comply with applicable local requirements and laws. We decline to do so.

*Obergefell* did not transform every same-sex relationship in the United States into a government-sanctioned marriage overnight. Indeed, in the five years since *Obergefell* issued, state courts continue to debate the question of whether *Obergefell* applies retroactively and, if so, to what extent. This remains an open question in Texas. *See In re LaFredo*, No. 05-18-01034-CV, 2018 WL 4561215, at *1 (Tex. App.—Dallas Sept. 24, 2018, orig. proceeding) (mem. op.) ("The legal question of whether *Obergefell* is retroactive has not been determined by the Supreme Court of Texas or by the U.S. Supreme Court."); *but see Ford v. Freemen*, 3:18-CV-3095-B, 2020 WL 4784635, at *1 (N.D. Tex. Aug. 18, 2020) ("the *Obergefell* holding applies

–18–

retroactively") (citing *Ranolls v. Dewling*, 223 F. Supp. 3d 613, 624 (E.D. Tex. 2016)).

We need not determine the issue of retroactivity here, however, because the evidence at trial was conflicting as to whether Ariel Sebastian was a person qualified under the Texas Family Code to conduct a marriage ceremony. *See* TEX. FAM. CODE 2.202(a). Even assuming without deciding that *Obergefell* applies retroactively and, as a result, relieved Hinojosa and LaFredo of establishing they obtained a valid marriage license in 2000, Hinojosa must still prove that he and LaFredo met the remaining requirements under Texas law to establish a valid, formal marriage—that the ceremony was performed by a person authorized to perform a marriage ceremony under section 2.202(a) of the family code. *See, e.g., Obergefell*, 576 U.S. at 675–76, (state laws are "invalid to the extent they exclude same-sex couples from civil marriage *on the same terms and conditions as opposite-sex couples*") (emphasis added); *see also Ranolls*, 223 F. Supp. 3d at 625 (applying *Obergefell* retroactively and denying summary judgment because genuine issues of material fact with respect to parties' marital status).

Here, LaFredo testified that Ariel was a friend of a very good friend that he and Hinojosa chose to be their spiritual psychic. LaFredo did not know if she was a minister or was licensed to perform any kind of wedding ceremony. LaFredo viewed her as a coordinator, not a minister, who was overseeing the ceremony to make sure it flowed. According to LaFredo, Ariel followed the script that he and Hinojosa put

together. Although Hinojosa testified that he believed Ariel had the authority to preside over a wedding, he presented no evidence to support that belief. Further, Hinojosa's counsel seemed to acknowledge the dispute and its impact on the question of whether a formal, ceremonial marriage formed in 2000 during the parties' discussions about the charge at trial.

At the informal charge conference during trial, Hinojosa's counsel explained he was requesting a question and special instruction regarding formal ceremonial marriage. Specifically, counsel argued the charge should include (i) a special instruction regarding ceremonial marriage stating that two people are formally married if they agreed to be married, attended a ceremony that married them, and the ceremony was officiated by someone who had the authority to do so, followed by (ii) the question of "Are Gus and Steve married?" At the formal charge conference, however, counsel did not request that special instruction to go with his proposed question on formal, ceremonial marriage, nor did he request any instruction that set out the requirements to establish the existence of a formal, ceremonial marriage under sections 2.001(a), 2.008, 2.201, or 2.202 of the family code. Hinojosa proposed no instructions or definitions on what was required to be formally married in Texas or elsewhere on October 26, 2000 or at any other purportedly relevant time. Hinojosa also did not request granulated questions for the jury to answer whether each of those requirements were met. Instead, Hinojosa submitted a proposed question that asked the jury whether he and LaFredo became

married on October 26, 2000 without defining the term "married" or instructing the jury as to what requirements Hinojosa and LaFredo had to meet to become married under Texas law. Without such instructions or definitions, Hinojosa failed to submit a substantially correct proposed charge to obtain the fact findings necessary to establish that a formal, ceremonial marriage existed between he and LaFredo under Texas law. *See, e.g.*, *Watson*, 918 S.W.2d at 645 (requested question insufficient to preserve error if legal term included in question is undefined); *see also Janelli v. Janelli*, 220 S.W.2d 255, 256 (Tex. Civ. App.—Dallas 1949, no writ) (evidence raised question of fact as to existence of ceremonial marriage).

Given the defects in Hinojosa's proposed question on the existence of a formal, ceremonial marriage, we cannot conclude Hinojosa requested the question in substantially correct wording or that the trial court abused its discretion in refusing to submit it in the charge. The trial court's failure to submit Hinojosa's proposed question is, therefore, not grounds for reversal. We overrule Hinojosa's first issue.

## II.     Jury Instruction Referencing June 26, 2015

In his second issue, Hinojosa contends the trial court abused its discretion by submitting the following jury instruction:

> Prior to June 26, 2015, Texas did not legally recognize same sex marriage.

At trial, Hinojosa objected to the instruction in its entirety and requested that the trial court strike it from the charge:

HINOJOSA'S COUNSEL: Your Honor, my first objection is to the instruction entitled "Marriage Between Same-Sex Persons in Texas" which reads: "Prior to June 26, 2015, Texas did not legally recognize same-sex marriage."

I believe it is unnecessary. And although it is factually correct, it is flawed and should be omitted from the jury's instructions because -- for multiple reasons.

First: It is unclear from that instruction whether or not Texas now recognizes same-sex marriages formed prior to that date. It certainly causes confusion with the jury as to whether or not they need to apply any other instructions to the facts that occurred prior to that date or only to the facts that occurred subsequent to that date.

And it tilts -- sort of edges the jury by suggesting the facts that occurred prior to that date should be ignored or bear no weight.

Further, I believe, unfortunately, it gives them the unfortunate duty of deciding whether or not to retroactively apply it. This seems to be a matter of law and should not be before the jury.

I'm objecting to the instruction entirely, and I'm requesting that the Court strike it from the jury charge.

The trial court overruled these objections and included the instruction in the charge.

On appeal, Hinojosa generally contends the instruction misstates the law and, alternatively, was incomplete, which confused the jury and probably resulted in an improper verdict. More specifically, Hinojosa argues first, that the instruction is a misstatement of the law because "when analyzing the current law that is to be applied to this case, the proper instruction should be that Texas legally recognizes same-sex marriages." He also contends the instruction was incomplete and confused the jury because the instruction "consisted of what the law *was*" but "the jury was not instructed on what to do with what the law *was*" and "the exact importance of the

date was not explained to the jury" even though counsel for both parties referenced the date during opening statements and closing arguments. Hinojosa maintains this confusion manifested itself in the jury's question during deliberations. According to Hinojosa, inclusion of the instruction probably resulted in an improper verdict because if the instruction had not been given, "the importance of that date would not have been emphasized to the jury."

Appellate jury charge complaints must comport with the objections made in the trial court. *Bishop*, 553 S.W.3d at 674. If the appellate complaint does not match the trial court objection, the complaint is not preserved for review. *Id.*; *Ramirez v. Welch*, No. 05-16-00681-CV, 2018 WL 3725254, at \*14–15 (Tex. App.—Dallas Aug. 6, 2018, no pet.) (mem. op.) (addressing only complaints raised in the trial court and appeal). Here, Hinojosa's first appellate argument, that the instruction misstated the law and should have stated that "Texas legally recognizes same-sex marriages," was not raised in the trial court. Hinojosa failed to preserve this complaint for review and we, therefore, do not address it here.

Hinojosa's remaining appellate complaints are that the instruction was incomplete and confusing because it did not explain the importance of the date of June 26, 2015 and did not instruct the jury on what to do with the information provided in the instruction. These appellate complaints are different from Hinojosa's trial court objections. Hinojosa has, therefore, not preserved these complaints for review. Accordingly, we overrule Hinojosa's second issue.

–23–

Even if the asserted error had not been waived, Hinojosa has not established that inclusion of the instruction probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). We reverse a judgment for charge error only if the error was harmful, meaning the error "probably caused the rendition of an improper judgment." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). When harm is not presumed, we examine the entire record to determine whether the instruction probably caused the rendition of an improper judgment. *Enbridge Pipelines (N. Tex.) L.P. v. Sullivan*, No. 12-19-00147-CV, 2020 WL 2991499, at \*3 (Tex. App.—Tyler May 29, 2020, no pet.) (citing *Gunn v. McCoy*, 554 S.W.3d 645, 676 (Tex. 2018)).

Here, Hinojosa points to the jury's note during deliberations as proof that the instruction caused confusion and the rendition of an improper judgment. During deliberations, the jury sent the judge a note asking the following question:

> If a same sex couple met the requirement of informal marriage before June 26, 2015, does the Obergefell decision state whether the effective date of the informal marriage is the date of the Supreme Court decision or the date the conditions were met?

The trial judge responded in writing as follows:

> You have all the law and instructions to answer the question in the jury charge.

Neither party objected to that response and neither party requested that the trial court provide the jury with additional instructions.

The jury note does not support the conclusion that the instruction confused the jury and caused the rendition of an improper judgment because clarification sought by the jury regarding the "effective date" of the marriage was relevant only to the second question in the charge, which the jury did not reach. The effective date of a same-sex informal marriage is immaterial to the threshold question presented to the jury in Question Number One—whether Hinojosa and LaFredo met the requirements to establish an informal marriage. Seeking clarification as to the "effective date" of an informal marriage does not indicate confusion about the requirements of an informal marriage. Rather, it indicates, at most, a desire for additional instruction on how to determine the date of the marriage should the jury reach the second question in the charge.

Moreover, the parties' counsel both explained the significance of June 26, 2015 during their closing arguments and told the jury how they should answer the second question. Hinojosa's counsel told the jury the date of the informal marriage was March 19, 2005, which was when Hinojosa moved to Dallas following LaFredo's work transfer. LaFredo's counsel, in contrast, argued the parties were not informally married because the three requirements were not met either before or after June 26, 2015. LaFredo's counsel told the jury that if they disagreed and answered "yes" to the first question, then the jury should find the date of the marriage to be June 26, 2015 when Texas recognized same-sex marriages. The jury had the parties' explanations of how to apply the law provided in the charge to the facts of the case.

–25–

Under those circumstances, inclusion of the instruction did not probably cause rendition of an improper judgment. *See, e.g.*, *Hagan v. Pennington*, No. 05-18-00010-CV, 2019 WL 2521719, at \*15–16 (Tex. App.—Dallas June 19, 2019, no pet.) (mem. op.) (exclusion of proposed instruction on who had the burden of proof did not probably cause rendition of improper judgment because the parties' counsel explained to the jury which party had the burden of proof).

## CONCLUSION

We conclude the trial court did not abuse its discretion by refusing to submit Hinojosa's proposed question on formal, ceremonial marriage to the jury and by including the instruction referencing June 16, 2015. Accordingly, we overrule Hinojosa's appellate issues and affirm the trial court's judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

181543F.P05

–26–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GUSTAVO NOEL HINOJOSA,
Appellant

No. 05-18-01543-CV          V.

STEVE PAUL LAFREDO, Appellee

On Appeal from the 302nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-15-16693.
Opinion delivered by Justice Partida-
Kipness. Justices Nowell and Evans
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee STEVE PAUL LAFREDO recover his costs of this appeal from appellant GUSTAVO NOEL HINOJOSA.

Judgment entered this 31st day of December, 2020.